GRAY, EXECUTOR, APPELLANT, *v.* GRANT ET AL., RESPONDENTS.

(No. 4,653.)

(Submitted February 4, 1922.   Decided March 6, 1922.)

[206 Pac. 410.]

*Accounting—Estates of Deceased Persons—Transfer of Mining Claims—Oral Contracts—Insufficiency of Evidence—Declarations of Decedents.*

Appeal and Error—Equity—Findings—Insufficiency of Evidence.
   1.   On appeal in an equity case, where there is little or no conflict in the evidence which in itself is unsatisfactory in character and furnishes no substantial basis for the findings of the trial court, the supreme court will not hesitate to set them aside and finally determine the rights of the parties.

Accounting—Divestiture of Title to Mining Claims—Oral Contract—Evidence—Insufficiency.
   2.   In an action for an accounting for proceeds of mining property claimed by defendant under an oral agreement with the decedent owner thereof, under which decedent was alleged to have promised that if defendant would advance to him money from time to time as he might need for his maintenance and for development work on the property, he would repay him in case the claims were. sold, or if not sold, then the whole property should become his at the death of the owner, evidence *held* insufficient to support the findings of the trial court in favor of defendant.

Evidence—Declarations of Decedents—To be Received and Weighed With· Caution.
   3.   Though declarations against his interest made by a decedent are admissible under section 10514, Revised Codes of 1921, they constitute testimony of unsatisfactory character and should be received and weighed with caution.

*Appeals from District Court, Beaverhead County; William A. Clark, Judge.*

ACTION by George Gray, as executor of the last will and testament of Thomas Haw, deceased, against Daniel Grant and others.   From judgment for defendants and an order denying his motion for new trial, plaintiff appeals.   Reversed and remanded, with directions to enter judgment for plaintiff.

*Mr. H. B. Duff* and *Messrs. Norris, Hurd, Rhoades & Collins,* for Appellant, submitted a brief; *Mr. Edwin D. Norris* argued the cause orally.

*Mr. C. W. Robinson* and *Mr. E. B. Howell,* for Respondent, submitted a brief; *Mr. Howell* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action for an accounting. Although brought against the several defendants named, the trial proceeded only as to the defendant Daniel Grant, the record not being clear as to what disposition was made thereof as respects the other parties defendant. A jury was impaneled, to which were submitted two special interrogatories, both of which were answered favorably to the defendant Grant. The plaintiff filed motion to set aside the findings of the jury, and requested the court to make certain findings of fact and conclusions of law submitted, both of which were denied; and thereafter the court made its own findings of fact and conclusions of law, and entered judgment in favor of the defendant Grant. This appeal is from the judgment and from an order denying plaintiff's motion for a new trial.

Summarized, the complaint alleges that Thomas Haw died in Beaverhead county on or about the twenty-fifth day of July, 1913, leaving real and personal property therein, which by his last will and testament were devised and bequeathed to Mary E. Gray, Mrs. John Robertson, and Milton Hayes. Of Haw's estate the plaintiff was duly appointed executor. Prior to the thirtieth day of September, 1907, Haw was possessed of certain mining claims situated in the Elkhorn mining district, Beaverhead county, known as the Dubois, Grotto and Leap Year quartz lode mining claims, upon which he had done all the representation work required by the laws of the United States and the state of Montana, and by conveyance in writing on the thirtieth day of September, 1907, he purported to convey said mining claims to the defendant Daniel Grant, but that the conveyance was without consideration, and after such conveyance said Haw continued to improve such property and remained in the full possession, control and dominion thereof, with the knowledge, consent and acquiescence of the defendant

Grant; that on or about the fifteenth day of November, 1910, Haw, Grant and the defendants Ripley and Robison entered into an agreement with one Frank B. Felt by the terms of which Felt was authorized to sell the Dubois, Grotto and Leap Year quartz lode mining claims belonging to Haw, together with certain other mining claims belonging to Grant, Ripley, and Robison. On the sixteenth day of January, 1911, Felt, Haw, Grant, Ripley and Robison entered into a second agreement, wherein it was provided that, as they were about to receive $150,000 for the entire group of mining claims, the proceeds of the sale should be divided as follows: Of $9,000 to be paid in cash, Felt was to receive $4,000; Grant, Ripley, Haw, and Robison $1,000 each; and to any person making the sale, not a party to the contract, the sum of $1,000; and upon final payment a commission of five per cent of the purchase price; the balance of the sale price to be divided so that Robison would receive $13,000 additional, Felt $29,750, less commission if not sold by party named in the agreement, and Grant, Ripley, and Haw each $32,750, less commission.

It is further alleged that the Dubois, Grotto, and Leap Year quartz lode mining claims were optioned to W. R. Allen for the sum of $150,000, and that certain payments had, prior to the institution of the action, been made by Allen upon the property, and that Grant, after the death of Haw, had received on November 15, 1916, $2,183.35, and on May 15, 1917, a like amount which Grant retains and refuses to deliver to the plaintiff the executor of the Haw estate. It is further alleged that the Boston & Montana Development Company as assignee of Allen's interest, is obligated to pay, and will pay a further sum of $33,750, among other amounts, which sum belongs and will belong to the plaintiff as executor of the Haw estate. The prayer is for an accounting by the defendant and for judgment in plaintiff's favor for the amount due Haw.

By separate amended answer of the defendant Grant, upon which the case went to trial, it is admitted that Haw, prior to the thirtieth day of September, 1907, was in possession

of the Dubois, Grotto and Leap Year quartz lode mining claims, and had done the representation work thereon required by law, and denial is made that on the thirtieth day of September, 1907, Haw conveyed said mining claims to defendant Grant, but he "admits that the said Thomas Haw by deed, bearing date of September 30, 1907, but not delivered to this defendant until the —— day of ——, 1912, conveyed the said mining property to the defendant", and denies that after the date of the deed, during the remainder of Haw's lifetime, or any time later than the delivery of this deed, to the defendant Grant, Haw made improvements on or prosecuted development work upon or retained or exercised control over the mining claims. It is admitted that Haw was to receive $32,750 under the terms of the agreement referred to in the plaintiff's complaint; and that the amounts alleged in the complaint are the amounts received by the defendant Grant. Affirmatively it is alleged that an agreement was made prior to the —— day of ——, 1905, between Haw and Grant, under the terms of which Grant was to advance Haw, who was in need, such funds as he might require from time to time for his support and for development work upon the mining property involved; that in the event the mining claims were sold prior to Haw's death, Haw was to repay Grant; but in the event they were not sold, then Grant was to become the owner of them, and that Grant had advanced money in excess of $3,000 to Haw for the purposes mentioned prior to Haw's death. It is further alleged that on or about the —— day of ——, 1912, the deed was delivered to Grant in pursuance of such agreement, and that Grant fulfilled all the terms and provisions of the agreement, and paid claims against Haw after the latter's death, amounting to $743. Further, that at the time the agreement was entered into, the mining claims were of small value, and that title to the same at the time of the delivery of the deed vested absolutely in the defendant Grant. These affirmative allegations are denied by plaintiff's reply.

After commencement of the action, other payments were made by the Boston & Montana Development Company, to Grant, which fact developed during the course of the trial, and on that account a supplemental complaint, to conform to the proof, was filed, which differs from the original complaint only as to the amount of payments made to Grant on account of the Haw interest; and prayer is made specifically for the sum of $6,281.74, and that the defendant Grant be required to execute and deliver an assignment of one-half of his interest in the security put up by W. R. Allen, or the Boston & Montana Development Company, for the payment of the balance of the purchase price for the mining property.

The special interrogatories submitted to the jury, with their findings, are as follows: "Interrogatory No. 1. Did the defendant Daniel Grant and Thomas Haw, about the year 1906, enter into an agreement by which said Thomas Haw agreed with defendant Grant that if said defendant would advance to him, the said Thomas Haw, such funds from time to time as he might need for his maintenance and the maintenance of his mining property, he, the said Thomas Haw, would repay the defendant Grant if the property were sold during the lifetime of Haw, otherwise the said property at the death of said Thomas Haw should become the absolute property of the defendant Grant? Answer: Yes." "Interrogatory No. 2. If in the answer to the last interrogatory, you have said that Thomas Haw and the defendant Grant entered into such an agreement, did the defendant Daniel Grant thereafter perform his part of said agreement? Answer: Yes."

The court did not adopt the jury's findings, but made its own, comprising eleven in number, all of which are in favor of the defendant Grant. Those numbered 4, 5 and 6 are here set forth, as they clearly illustrate the principal issue involved in the case, and the court's theory in its conclusions of law. They are as follows:

"No. 4. That on or about the thirtieth day of September, 1907, the said Thomas Haw and the said Daniel Grant, a de-

fendant herein, entered into an agreement by the terms of which the said Thomas Haw agreed with the defendant Grant that if the said defendant Grant, would advance to him, the said Thomas Haw, such funds as he might need from time to time for his maintenance and the maintenance and development of his mining property, the said Thomas Haw would repay the said defendant Daniel Grant, if the said mining claims, mentioned in finding of fact No. 2, were sold during the lifetime of said Haw, otherwise, if not sold during the lifetime of said Haw, the said mining claims, mentioned in finding No. 2, at the death of said Thomas Haw, should become the absolute property of the defendant Daniel Grant.

"No. 5. That on or about the thirtieth day of September, 1907, the said Thomas Haw, pursuant to the agreement mentioned in finding No. 4 above, executed to the said defendant Daniel Grant a certain instrument, in writing, and conveyance, which provided that in consideration of the sum of $1 to him in hand paid by the said Grant, the receipt whereof is acknowledged, he, the said Haw, granted, bargained, sold, demised, and released, and forever quitclaimed to the said Grant by said instrument, and to his heirs and assigns, the said Dubois, Grotto, and Leap Year quartz lode mining claims, which said claims are recorded respectively in Book 20, at pages 200, 199, and 493, of the Records of Quartz Lode Claims of Beaverhead county, Mont., which said instrument was retained in the possession of the said Thomas Haw until on or about the twelfth day of November, 1912, on or about which said date the said deed was delivered by the said Haw to the said Daniel Grant, and by the said Grant recorded on or about the eighteenth day of November, 1912.

"No. 6. That pursuant to the agreement and understanding, mentioned in the foregoing finding No. 5, the said Daniel Grant, during the lifetime of said Haw, advanced certain sums of money and paid certain debts and furnished certain funds for the prosecution of the work upon the mining claims hereinbefore mentioned in these findings, which sums were in excess

of $3,000, and met all of the demands personally made upon him by the said Haw under the terms of the agreement mentioned in finding No. 5 above, with reference to furnishing money and supplies to the said Haw, and performed each and all of the terms and conditions of his said contract with said Haw.''

The conclusions of law are two, reading as follows:

''No. 1. That on the death of the said Thomas Haw the said Daniel Grant became the absolute owner of, and entitled to the possession of, all of the mining property mentioned and described in plaintiff's complaint, to wit, the Dubois-Grotto, and Leap Year quartz lode mining claims; and he was, and is now, entitled to receive for his own use and benefit all of the proceeds of the sales of said claims which had been paid to him by virtue of the contracts and agreements mentioned and described in the findings of fact in this cause.

''No. 2. That the said plaintiff, as the executor of the last will and testament of said Thomas Haw, or otherwise, has no interest, right, title, or claim in and to the said property described in his said complaint, to wit, the Dubois, Grotto, and Leap Year quartz lode mining claims, or any right, title, interest or claim upon, or claim to, any of the proceeds of the sales of said claims arising out of any of the contracts mentioned and described in the findings of fact herein filed, or otherwise.''

Many specifications of error are assigned, but as this is an equity case, it is necessary to consider but one question determinative thereof, namely: Did the court err in its findings of fact and conclusions of law, and in entering judgment in favor of the defendant Daniel Grant?

The plaintiff relies upon the contract signed by Haw and the defendant Grant, Ripley, Robison and Felt, the latter's interest having been assigned to the defendant Olmstead; dated January 16, 1911, under the provisions of which Haw was to receive, in the event the property sold for $150,000, as it subsequently did, the sum of $1,000 cash payment, and $32,750,

less commission, out of the payments deferred. The defendant Grant bases his case entirely upon an alleged oral agreement made with Haw in the year 1905 or 1906, by which Grant was to furnish Haw with money to take care of his claims and himself, with the understanding that when the property was sold, Haw would repay Grant, and that if anything happened to Haw, so that he died before the property was sold, Grant was to have it. All question and confusion as to the defendant's theory concerning his rights are eliminated by the position taken and declarations made by his counsel in this court and during the trial. At the trial defendant's position was stated by his counsel as follows:

"There is no contention on the part of the defendant Grant but what Thomas Haw owned this property during his lifetime. We do not expect to contend that this deed when given was an absolute conveyance, and that Thomas Haw retained no interest whatever; this deed was simply one step in the fulfillment of this agreement, which was made in 1905 or 1906, and there was no occasion whatever for the defendant Grant and Thomas Haw to make any mention whatever of this Felt agreement; that was between different parties. * * * We do not claim on behalf of this defendant that the recording of that deed or the giving of that deed terminated Tommie Haw's interest in these claims. Under the agreement he still had interest up to the time of his death. * * *

"By the Court: Your admission is that you do not claim any title through this conveyance until Tommie Haw was dead?

"By Mr. Howell (one of defendant's counsel): The conveyance did convey the legal title, but Tommie Haw still had a beneficial interest as long as he lived. When he died, then under this agreement the property became the property of Daniel Grant; that is our view of this matter.

"By Mr. Hurd (of counsel for plaintiff): I understand that the record may show that at the time this deed was recorded, the property in it was Tommie Haw's property absolutely.

"By Mr. Howell: It is not the contention of the defendant Grant that the giving or recording of this deed vested absolute title to the property in the defendant Grant. It did vest the legal title in the defendant Grant. * * * "

The defendant Grant himself, in putting forth his position, testified that Haw remained the owner of these three claims after the recording of the deed, except the legal title stood in his (Grant's) name, and as to defendant's rights asserted under the oral agreement had with Haw in the year 1905 or 1906 he testified:

"Q. Mr. Grant, was there anything said by Mr. Haw and yourself about security at any time for any of the moneys that you had advanced? A. No, sir.

"Q. Did you demand of Thomas Haw at any time a deed for this property? A. I did not.

"Q. Did you at any time rely upon this deed as security for advances made by you? A. No, sir; I did not.

"Q. You relied solely upon your agreement with Tommie Haw? A. I did."

The defendant Daniel Grant was the only witness called in chief in support of the plaintiff's case, which was then rested, and the defendant then sought to establish his defense. It will serve no useful purpose to review the evidence offered by the plaintiff, so that we shall proceed to a consideration of the testimony offered by the defendant Grant in support of his contention.

All of the evidence in support of the defendant Grant's position, admitted over plaintiff's objection, falls short of sustaining him. The defendant Daniel Grant, in his own behalf, testified in part as follows:

"Q. How long have you lived in Beaverhead county? A. About twenty years.

"Q. Were you acquainted with Thomas Haw during his lifetime? A. I have known him practically ever since I have been in the country.

"Q. Practically ever since you have been in the state? A. Yes, sir.

"Q. Who was Thomas Haw? A. He was a Chinaman.

"Q. Did you have any business relations with Thomas Haw during his lifetime? A. I had; yes, sir.

"Q. And those business relations were concerning what, Mr. Grant? A. They were in relation to mining.

"Q. Such negotiations, or business transactions, were oral, were they? By word of mouth? A. Oral agreements.

"Q. All of them except this written agreement of January 16, 1911, is that correct? A. Yes, sir.

"Q. When did your business relations first begin with Mr. Haw? A. Well, it was the year 1905 or 1906. I would not say just positively.

"Q. How long did they continue? A. Up to the time of Thomas Haw's death in 1915.

"Q. Did you between the year 1905 and the time of his death advance certain sums of money on various occasions to Thomas Haw? A. I did.

"Q. Just state now to the court what arrangement, what agreement you and Mr. Haw had at the time you commenced advancing money. A. Mr. Haw and I went up to the Elkhorn district, and there was three claims there known as the Central, Silver Star, and the Aspen, I believe, at that time. I would not say whether it was the Aspen or not. Mr. Haw wanted me to take an interest in those claims with a party by the name of Mr. Avery, and I did. Later on, a month or so, Mr. Ripley and I went up, and Mr. Ripley, Avery, and myself took an equal interest in these three claims at that time, and started doing work there. In the meantime Mr. Haw stated to me that he was financially—his finances—he didn't have any finances.

"Q. Go ahead and tell what the balance of that agreement was, or what you and Mr. Haw done. A. Well, then Mr. Haw and I talked the matter over, and he stated to me that if I would help him out, loan him such money as he needed in

the way of representing these claims, his living expenses, and such as that, that in case anything should happen to him before the property was sold—or the property was sold before his death, he would repay me, and, if not, that I was to have the property. That was the agreement between Mr. Haw and I.

"Q. In pursuance of that agreement, what did you do? A. I went ahead and gave him money at different times whenever he asked for it.

"Q. It was customary for him to come to you for financial aid from that time on until the time of his death? A. Yes; it was.

"Q. Did he ever request any money of you that you refused to give him? A. He never did.

"Q. During the time of his last sickness, did you advance different sums of money? A. I did; yes, sir.

"Q. Was you here at the time of his death? A. I was.

"Q. Had you been in Dillon and in. this immediate vicinity during the last few weeks of his sickness all the time? A. Not all the time, no.

"Q. What arrangement did you make for his care or attention during the time that you would be away from here in his last sickness? A. Well, I told Dr. MacMillan, the doctor he had taking care of him—I told him to give him all the care he needed, giving him anything he wanted, and see that he was taken care of.

"Q. Did you make any other arrangements than with Dr. MacMillan as to that? A. Any other arrangements?

"Q. Yes; I will ask you if you had any other person to go to look after him, or anything of that kind, or to see to his wants? A. I don't know, without I told Dr. MacMillan to. I told you (Attorney Robison) to myself; I told you to go up and see he had everything that was needed.

"Q. Was you in any way indebted to Haw in any respect during any of the time that you was advancing him money? A. No, sir; I was not.

"Q. Was you under any obligations to Haw at any time this agreement was made in any way? A. No, sir.

"Q. How often did you talk to Thomas Haw about his business affairs? A. A number of times.

"Q. Do you have any idea how many times you have heard him make that statement or say that? A. Dozens of times, as far as that goes. I don't know how many, several different times.

"Q. Mr. Grant, about how much work did you do on this property, this group of claims? A. Well, we run a 1,000 foot tunnel, a little better than 1,000 feet, besides work done on the outside.

"Q. About what did it cost you a foot to run that tunnel? A. We figured about $10 a foot.

"Q. Did you do other representing there on these various claims? A. Yes; we did; I did.

"Q. And also other representing work on the claims of Thomas Haw? A. We did; yes, sir.

"Q. That is the three claims in question. A. Yes, sir.

"Q. How many years did that take you, Mr. Grant; how long were you doing the work? A. I think we started the tunnel in 1907, and worked on it until 1912.

"Q. Who paid for Thomas Haw's part of that work down there? A. I did.

"Q. Did Thomas Haw also perform some work and labor up there during this time? A. Yes; he did.

"Q. What did he do? A. Well, Tommie done the cooking for us, and once in a while he would go out and prospect around and do what little he could. He was not able to do much.

"Q. What were you doing during that time? A. I worked in the tunnel different times.

"Q. Mr. Ripley also worked in the tunnel? A. Yes; he did.

"Q. At that time? A. Yes.

"Q. Mr. Grant, did you keep any account of the money that was advanced by you to Thomas Haw during the time that

this agreement was in force between you? A. I didn't keep no close record of it at all.

"Q. That extended over a period of something like six years, did it? A. It did; yes, sir.

"Q. Now, at the time of this agreement or during the various talks between you and Thomas Haw, at any time was there ever anything said about any interest being paid upon this money? A. No, sir; there was not."

Upon cross-examination Mr. Grant testified in part as follows:

"Q. Mr. Grant, when was it that you said this agreement was first made between you and Mr. Haw? A. Well, it was along in 1905 and 1906; I would not say for sure which.

"Q. In 1905 or 1906? A. Yes, sir.

"Q. And what time in the year was it? A. Well, I don't know.

"Q. The agreement was at that time that you were to put up for him certain money, and that when he sold the mining claims, he would pay you—is that it? A. How is that?

"Q. You were to put up for him certain moneys, and when he sold his mining claims, he would pay you; is that it? A. Yes, sir.

"Q. This applied to all mining claims which he then was possessed of, did it? A. Yes, sir; in the Elkhorn district.

"Q. That is the three involved in this case and some other mining claims he had scattered around in the Argenta district? A. No; sir.

"Q. Were there other mining claims besides those included in that understanding? A. Not in this agreement between Mr. Haw and I.

"Q. Immediately after the agreement was made, did you advance him any money? A. I did.

"Q. How much did you advance him? A. I could not tell you just what it was.

"Q. When did you advance it to him? A. I could not tell you that.

[62 Mont. 452.]

"Q. You don't know whether that was in 1905 or 1906?
A. I would not say that.

"Q. After the first, when was the second payment or advancement of money made to him? A. I never kept no dates of it.

"Q. What was the amount? A. I never kept no track of the amounts even.

"Q. How many different times were there when you advanced him money? A. I could not say as to how many times.

"Q. And yet he was to pay you back if he sold the mining claims? How were you going to know how much you had advanced him? A. I left that to his honesty.

"Q. That is, you gave him money under an agreement that he was to repay you whenever he had sold the claims, and you made no charge against him for the amount? A. No, sir; I did not.

"Q. You haven't any entry in any book or any memorandum of any kind to show the amounts and dates? A. I have not at the present time; no, sir.

"Q. When did you cease to advance him money? A. I never did.

"Q. He died on July 15, 1913, or thereabouts. Did you advance him any money up to that time—on that date—or at a date closely preceding that? A. I did; yes, sir.

"Q. How much did you advance him then? What was the last payment you made, in other words? A. Well, I could not tell you that.

"Q. You, of course, didn't know he was going to die at that time? A. I did not; no, sir.

"Q. You made no entry in your books so as to have the amount that you then advanced? A. No; I did not.

"Q. At that time you were engaged in business at Dillon? A. I was.

"Q. And kept books in connection with your business? A. Yes, sir.

"Q. And yet there was no entry of any kind made by you concerning this transaction? A. No; there was not.

"Q. You, of course, then, in testifying as to the amounts of those advancements, have no definite information to convey to the jury concerning that matter? A. Nothing definitely.

"Q. The best that you can do concerning the matter is to venture a guess? A. Yes, sir.

"Q. You don't know whether it is, though, accurately $1,000, $1,500, or $2,000, or what it is? A. I know it is more money than that.

"Q. How did you pay Mr. Haw when you did advance it? A. He would come and ask me for some money, anywheres from $10 up.

"Q. You gave him the money? A. Yes.

"Q. You never gave him any checks? A. Not that I remember of.

"Q. Have you examined your checks to determine whether you have any checks payable to the order of Thomas Haw, which was subsequently indorsed and paid through the bank or clearing house? A. No; not that I know of.

"Q. After the first conversation that you had with him in relation to this agreement here in 1905, what was the occasion of his referring to it again, or repeating it? How did that matter arise? A. Because I was accommodating him, I suppose; giving him money to live on.

"Q. You had your agreement on a certain day as to what you were to do and what he was to do. How did it happen that subsequent discussion of what the terms of that agreement were came up? A. He wanted to keep it fresh in my memory, I guess.

"Q. You knew you had such an agreement? A. I certainly did.

"Q. He knew it, if he made it, I suppose? A. Yes, sir.

"Q. Why was it that there was subsequent discussion concerning that agreement? A. I don't know why it was.

"Q. You said he frequently referred to it? A. Yes, sir.

"Q. How frequently? A. Oh, I could not tell you.

"Q. Once a month or once a year, or how? A. It may have been two or three times a month, or it may have been every two or three months.

"Q. By the way, Mr. Grant, do you recall the fact that he had some mining claims up at Argenta? A. Yes, sir.

"Q. You knew of that fact? A. I did.

"Q. He received money from time to time through you upon those mines there as royalty or otherwise? A. A little, yes.

"Q. He had received money on that as late as 1912 through you, did he not? A. No, sir; I don't think so.

"Q. Just before—well, in 1911—just before this agreement was signed between you, Mr. Felt, Mr. Ripley, Mr. Robison, and Haw, he received a payment through you from the Argenta mines, did he not? A. I could not say as to that.

"Q. Is it not a fact that at all times after you people began to drive the tunnel that you have referred to that Thomas Haw received from you pretty frequently remittances from the Argenta mines he owned? A. Very little.

"Q. Did you keep an account of the amount you paid him from those mines? A. No; I did not.

"Q. You simply received it and paid it over? A. Yes, sir.

"Q. From whom did you receive it? A. It came through the Washoe Smelter Works.

"Q. Where was that smelter? A. Anaconda, I believe. Anaconda Smelting Company.

"Q. How much altogether in the year 1907, did you pay him as receipts from the Argenta mine? A. I could not tell you. I don't remember.

"Q. Well, was it as much as $250? A. I could not say as to that.

"Q. You did receive money that year, and that extended over a long period of years—the receipts from that Argenta property? A. I don't know how many years.

"Q. It was quite a long time in there, was it not, before his death? A. Not very many years; no.

"Q. It was at least five or six years; it was during all the time after 1907 down to the time this Felt, Ripley, Grant, Robison, and Haw agreement was signed; in other words, the agreement of January 16, 1911, was it not? A. I don't know; I couldn't say as to that. I don't think it was, though.

"Q. What were the usual payments that you received and turned over to Haw during that time? How much would you receive at a time? A. The royalty would run along a hundred, hundred twenty, hundred fifteen, eighteen, something like that, as near as I can remember.

"Q. How frequently would those checks be received by you and the proceeds paid over to Thomas Haw? A. Not very frequently, possibly—well, I don't know.

"Q. What is your best recollection, Mr. Grant, as to the amount you paid him, for instance, in the year 1911? A. I have no idea. I don't know a thing about that.

"Q. Did you have an idea as to the amount in 1910? A. No, sir.

"Q. The check was made payable to you, was it not? A. I think it was.

"Q. And you indorsed the check and sent it through the banks to be paid, of course, and then you paid the money, or some of it, over to Thomas Haw; is that the arrangement? A. Yes, sir.

"Q. You kept no record at all of the amounts of those checks? A. I did not; no, sir.

"Q. You do not claim that these Argenta mines are included in this agreement that you had with Thomas Haw—that you have testified to this afternoon? A. They had nothing to do with that.

"Q. They had nothing to do with that? A. No, sir."

E. J. Ripley, one of those named as a party defendant in this action, testified as a witness on behalf of the defendant Grant in part as follows:

[62 Mont. 452.]

"Q. You are one of the owners in the so-called group—central group, in the Elkhorn mine? A. Yes, sir.

"Q. One of the parties to this Allen contract? A. Yes, sir.

"Q. Did you know Thomas Haw during his lifetime? A. Yes, sir.

"Q. How long had you known him? A. I have probably known him in the neighborhood of twenty years, twenty-five, maybe.

"Q. Did you at any time stay or work up in the Elkhorn district yourself at a time when Thomas Haw was there, and were you working at the time he was there? A. Yes, sir.

"Q. Did you have any talk with him, Mr. Ripley, as to the disposition which he expected to make of his property at the time of his death? A. Yes; I had a talk with him. I think it was the winter of 1911. I had a talk with Thomas Haw, and I asked him—I says—it just came up in a casual way. We were sitting in the cabin and I said to him: 'What disposition have you ever made of your property in case you should die?' 'Well,' he says, 'it is all fixed.' He says: 'Nobody quarrel over what I got.'

"Q. What year was that? A. That was in 1911.

"Q. Do you remember the month and day of the month? A. It was either in November or December, 1911."

Forest Herr, a witness on the part of the defendant Grant, testified in part as follows:

"Q. Was you acquainted with Thomas Haw during his lifetime? A. Yes, sir.

"Q. Did you know him in the Elkhorn mining district? A. Yes, sir.

"Q. Did you have any conversation with him in the Elkhorn district relative to Mr. Grant and his property? A. Yes; he told me one day—

"Q. Just state what your conversation was. A. Well, he told me if it had not been for Mr. Grant he could not have kept up the assessment work; that he had been advancing him money. He told me another thing: 'When I die, I am'—he

would leave everything to Mr. Grant. He told me that in Elkhorn.

"Q. When was this conversation, Mr. Herr? A. Well, I think it was in 1906, I would not be sure; it was either 1906 or 1907; I would not be sure."

M. E. Henneberry, a witness on behalf of the defendant Grant, testified in part as follows:

"Q. Was you acquainted with Thomas Haw during his lifetime? A. I was.

"Q. What was that acquaintance with Mr. Thomas Haw, intimate or otherwise? A. Very intimate.

"Q. How long had you known Mr. Haw? A. Oh, I suppose thirty-five years.

"Q. I will ask you if you knew anything of the business relations between Dan Grant and Thomas Haw? A. Well, I had heard they had been in mines together.

"Q. I will ask you if just a short time before his death, when he was going to Butte for treatment, if you had any conversation with Mr. Haw at that time as to his financial condition with relation to being supplied with funds by Mr. Grant? A. Yes; I had a conversation with him.

"Q. About when did this occur, as near as you know? A. I think it was along about the 1st of June in the year 1913.

"Q. And whereabouts? A. At the depot over here at the platform.

"Q. In Dillon? A. Yes, sir.

"Q. What conversation did you have with him? Just go ahead and state the conversation you had with him relative to Mr. Grant furnishing him with funds. A. I asked him if he had any money. He said yes he had money. Tommie and I were pretty intimate. I said: 'How much money?' He said he had $100 or over that Grant had given him, $100 or over to take care of him while he was there."

Phil Thorp, a witness on behalf of the defendant, testified in part as follows:

"Q. Were you acquainted with Thomas Haw during his lifetime? A. Yes, sir.

"Q. How long had you known him? A. Oh, along in the early 80's.

"Q. I will ask you if Mr. Haw said anything to you about his financial condition at any time since 1906. A. Just made the remark—yes.

"Q. I will ask you now if he has told you where he was getting financial aid, or he has told you he was getting financial aid? A. Yes.

"Q. State what that conversation was, now, relative to Mr. Grant. A. He said that Mr. Grant had given him money at different times. I had loaned him money, and he told me to go to Mr. Grant to get it.

"Q. Did you get your money from Mr. Grant to cover this? A. I did."

The witness C. W. Robison, one of the defendants named in this action, and who appears to have acted as attorney for Thomas Haw in his lifetime, and also for the defendant Daniel Grant, testified for the defendant Grant in part as follows:

"Q. Were you acquainted with Thomas Haw during his lifetime? A. I was.

"Q. For how long did you know him? A. I have known Tommie Haw since the year 1900; during the year 1900, that was the time when I first became acquainted with him.

"Q. At that time what was he doing? A. Well, he was interested in a ranch to a certain extent, at that time, sheep.

"Q. Did you know what his financial condition was at that time? A. He was becoming somewhat involved in debt along about that time.

"Q. He had some property left, did he? A. Yes; he had some property.

"Q. Some considerable property, was it at that time? A. It was, as I understood from him and the community.

"Q. You were practicing law in Dillon at that time, were you? A. I located here at the time.

"Q. You have been here as an attorney ever since? A. I have.

"Q. Did you do any business for Thomas Haw during those years? A. I think the first business that I done for Thomas Haw was when—was in 1903.

"Q. Were you at that time attorney for Mr. Grant also? A. I don't remember. I started in to do Mr. Grant's business along in those years some place, as quick as—just prior to the time he became interested in the Elkhorn district.

"Q. You were interested in the Elkhorn district yourself? A. Yes; I became interested a short time after that. * * *

"Q. Well, now, will you please confine your testimony to conversations had when Mr. Grant was present, and state what those conversations were? A. Well, it was talked over different times. Sometimes it was in my presence, in my office, and sometimes it would be in Mr. Grant's place of business. I talked with him once in the Elkhorn on that. I do not think Mr. Grant was present on that occasion. I know that the sum and substance of those conversations were, when Mr. Grant and Mr. Haw were both present, that Grant was carrying him, advancing him money, and whenever he died, Grant was to have his property, unless the property was sold before his death, and in that case he was to pay Grant whatever he would get from him.

"Q. Do you have any knowledge of Grant actually having paid money to Haw? A. I do.

"Q. Will you tell how you know and to what extent such payments were made? A. After we became interested up there together, Haw would be here, and there would be times when Grant would be away, and I have gone to the saloon myself and got money for Haw and wrote out a tab for it there, and tell Grant about that when he came back; that was his instructions that whenever he was away and Tommie was in need for me to go in and get the money for him.

"Q. On such an occasion, how large an amount would be the sums that you would get? A. It would depend on what

Tommie Haw would ask for. I think $50 was the largest amount that I ever went in and got.''

The foregoing comprises all of the evidence introduced on the part of the defendant, in support of the alleged oral agreement between Haw and the defendant Grant in the year 1905 or 1906, whereby the defendant Grant was to advance to Haw such money as he needed for his support and improvement of his mining claims during his lifetime, upon which Grant bases his rights.

Under section 8805 of the Revised Codes of 1921, the duty is [1] imposed upon this court to determine questions of fact in equity cases, unless for good reason a new trial or the taking of additional evidence in the district court be ordered. In approaching final decision of this case we are not unmindful that, notwithstanding the provisions of the section above alluded to, it is the settled rule that this court will hesitate to overturn findings based upon substantially conflicting evidence, justifying an inference in favor of either party. (*Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6; *Finlen* v. *Heinze,* 32 Mont. 354, 80 Pac. 918; *Delmoe* v. *Long,* 35 Mont. 139, 88 Pac. 778; *Watkins* v. *Watkins,* 39 Mont. 367, 102 Pac. 860; *Copper Mt. Min. & S. Co.* v. *Butte & Corbin etc. Min. Co.,* 39 Mont. 487, 133 Am. St. Rep. 595, 104 Pac. 540; *Murray* v. *Butte-Monitor T. M. Co.,* 41 Mont. 449, 110 Pac. 497, 112 Pac. 1132; *Gibson* v. *Morris State Bank,* 49 Mont. 60, 140 Pac. 76; *In re Colbert's Estate,* 51 Mont. 455, 153 Pac. 1022.) However, in a case such as this, where there is little or no conflict in the evidence, which is unsatisfactory in character and furnishes no substantial basis for the findings of the trial court, this court will not hesitate to finally determine the rights of the parties. If a clear and satisfactory showing is not made in support of the findings, this court will in furtherance of justice, in proper cases, set them aside.

Admitting that the defendant Grant has offered some proof [2] in support of the alleged contract, yet it cannot be said to be of such clear and convincing character as to warrant

a court of equity in divesting the estate of the decedent Haw of title to his property. It seems absurd that the defendant Grant, claiming by virtue of such a contractual arrangement, should have kept no books respecting the advancements of cash by him in fact made to Haw during the latter's lifetime, for, had the property been sold in advance of Haw's death, what would be the basis of settlement? How could Haw repay Grant unless some account of advancements made were kept? And since Grant was making advancements, as he says, in large amounts, to Haw, a Chinaman over sixty years of age, it is more than strange that Grant should be entirely without some method of accounting. There is no showing whatever that Haw, the Chinaman, was educated, or a bookkeeper, or that he kept any books of account. Again, in the event that the property were not sold until after Haw's death, the defendant Grant must have realized, or should have done so, that in order to establish his rights, he must be in a position to show that he lived up to the alleged contract, made advancements, and the amount thereof. The record wholly fails to show the amount of the advancements by Grant made, nor is it clear that such as were made did not come from funds in Grant's custody—in fact, the property of Haw, representing money received from smelter returns from the shipment of ore made from the Argenta quartz lode mining claims to the Washoe smelter at Anaconda. It is also beyond understanding that, as to such moneys so received by Grant on Haw's account on ore shipments, and paid to Haw from time to time, Grant should have kept no books of account whatsoever. He gave no more definite idea in his testimony as to such amounts received by him on Haw's account and paid to the latter than as respects advancements alleged to have been made in cash to Haw from his own funds in furtherance of the alleged oral agreement, yet he professes to be a business man, and in the conduct of his saloon says that he kept books of account. Lack of explanation in these important particulars reflects discredit upon Grant's position.

The record is wholly barren of testimony as to the purpose of the execution of the deed to the mining claims in question, and as regards the delivery thereof. It appears to have been executed by Haw September 30, 1907, and left with Attorney Robison, but for what purpose does not appear. It was placed of record November 18, 1912, presumably by Attorney Robison, but for what purpose, or at whose direction, is not shown. However, it is noteworthy that the agreement with Allen for the sale of the property was made three days before (November 15, 1912), and that Haw does not appear to have been a party thereto, although he was a party to the contract of January 16, 1911.

Furthermore, Grant says that, even though the deed was recorded, he claimed no greater right thereunder than before during Haw's lifetime. He testified: "Q. Then, when you recorded this instrument, you recorded it under the theory that he owed you money? A. I did not. I recorded it so we could give a clear title to Mr. Allen for these claims. Q. That was the only reason? A. Yes, sir. Q. At that time you were representing, in the signing of the agreement, Thomas Haw, were you not? A. I was; yes, sir. Q. He had in the option then the same interest that you and the other four parties to the contract of January 16, 1911, had fixed among yourselves as your interest in the group. Is that not a fact? A. Yes; it is. Q. That is when you signed Exhibit 1 for the defendant—the option to Governor Allen—you did so in your own interest in central group of claims, and Tommie Haw's interest in the Grotto, Dubois, and Leap Year claims—that is a fact? A. In the group of claims; yes, sir. Q. In this option then, to Governor Allen, when the Haw interest—you signed this for Haw and yourself? A. Yes, sir. Q. And Haw remained, as to you, the owner of these three claims thereafter, did he not, except the legal title stood in you? That is a fact? A. Yes, sir."

The principal beneficiary of the testator, Haw, under the terms of his will, bearing date July 9, 1913, is Mrs. Mary J.

Gray, a rooming-house keeper, who is the wife of the plaintiff, George Gray, named therein as executor. Haw stayed at Mrs. Gray's house during his last illness, and died there.

It must be noted that the defendant Grant bases his case solely upon the oral statements made by Haw, a Chinaman, [3] who is now dead. The declarations made by the deceased were properly admissible to prove the contract (section 10514, Rev. Codes 1921) though testimony of this character is not satisfactory, and should be received and weighed with caution (*Roy* v. *King's Estate*, 55 Mont. 567, 572, 179 Pac. 821).

Mr. Chief Justice Brantly, speaking for this court regarding such character of evidence, in the case of *Escallier* v. *Great Northern Ry. Co.*, 46 Mont. 238, 248, 127 Pac. 458, 461 (Ann. Cas. 1914B, 468) well said: "Speaking generally, this character of evidence is the weakest and least satisfactory of any in persuasive value. 'With respect to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness by unintentionally altering a few of the expressions really used gives an effect to the statement completely at variance with what the party actually did say.' (1 Greenleaf on Evidence, 16th ed., sec. 200.) The weakness of this character of evidence is recognized by the statute, and it is thereby made the duty of a trial court on all proper occasions to instruct the jury that it is to be viewed with caution. (Rev. Codes 1907, sec. 8028; *McCrimmon* v. *Murray*, 43 Mont. 457, 117 Pac. 73.) It is a quality which attaches to all oral testimony as to declarations or admissions which are relevant to the issues on trial, and are competent because they are against the interest of the party making them or fall within some other rule of admissibility. Though the witness who testifies to the oral statement may be honest, his memory may be at fault, or he may have

failed to comprehend and interpret the statement as it was intended to be understood by the speaker. * * * Moreover, so easy is it to fabricate such evidence that there is strong temptation to a dishonest, interested witness to do so." (See, also, 17 Cyc. 606, quoted from at length, with approval, in the case last cited.)

The judgment is reversed and the cause remanded to the district court, with. directions to enter judgment for the plaintiff in accordance with the prayer of· the supplemental complaint.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES COOPER and HOLLOWAY concur.

MR. JUSTICE REYNOLDS, being absent, takes no part in this decision.

Rehearing denied April 3, 1922.