ROONEY, ET UX., APPELLANTS, FORD, ET AL., RESPONDENTS.
No. 9140.
Submitted November 17, 1952.   Decided March 24, 1953.
Amended on Denial of Hearing May 27, 1953.
256 Pac. (2d) 1090.

Messrs. Murch & Wuerthner and Mr. John P. Wuerthner, Great Falls, for appellants.

Messrs. Church, Harris, Johnson & Williams, Mr. H. Norskog, Great Falls, for respondent Lee M. Ford, Adm'r.

Messrs. Graybill, Bradford & Smith, Great Falls, for respondents William H. Rooney, et al.

Mr. P. J. Gilfeather, Great Falls, for respondents Edward F. Rooney, et al.

Mr. Julius J. Wuerthner, Mr. Clarence W. Murch, Mr. Leo C. Graybill and Mr. Carter Williams argued orally.

MR. JUSTICE FREEBOURN:

Plaintiffs and appellants brought action against defendants and respondents to quiet title to lot 13, and the west half of lot 12, in block 312, town or townsite of Great Falls, Cascade county, Montana.

From a judgment in favor of defendants, the plaintiffs appeal.

One, who reads the record here, gains the impression that H. H. Rooney, well fixed pioneer citizen of Great Falls, Montana, about ninety-five years of age, and nearing the end of this earthly life, realized "that you can't take it with you" when you die and proceeded to divest himself of all his real property by dividing it between three only sons: Asher, William and Edward.

When Asher's wife, Myrtle, a persistent soul, who believed her cause was just, learned that William had been given three pieces of real property and Edward five pieces, and well knowing "the old man" as she called him, she made known to him her desire that he give Asher and herself some of his real property, corresponding in worth to that given William and Edward. Her desire was gratified and H. H. Rooney, as grantor, signed, acknowledged and delivered to her a warranty deed to the real property at issue herein, in which she and Asher Rooney, her husband, were grantees.

Then Asher and Myrtle, as plaintiffs, filed this action to quiet title to the said real property, basing their title to the

same upon the said warranty deed, subject to the dower right of H. H. Rooney's widow, Charlotte.

Title to the property was sought to be quieted as against Lee M. Ford, administrator of the H. H. Rooney estate, and the two sons, William and Edward, and their wives.

The defendants by cross complaint, contended that the warranty deed was signed on December 28, 1948, when the grantor, H. H. Rooney, was "wholly incapable of transacting business, and wholly incompetent to sign, acknowledge and deliver to the plaintiff, Myrtle Rooney, * * * a deed of warranty conveying the real property described * * *."

Upon trial the district court held the warranty deed to be null and void and entered judgment for defendants.

Appellants' specifications of error stem from the findings and conclusions of the trial judge: That evidence, admitted during the trial without objection thereto, amended the pleadings and established that a "relation of personal confidence" existed between plaintiff, Myrtle Rooney, and the deceased, H. H. Rooney, when the warranty deed was signed; and the "pleadings * * * were and are amended to allege the facts relating to and establishing such relation of personal confidence between said Myrtle Rooney and said H. H. Rooney."

The trial court made no finding that H. H. Rooney, when he signed the warranty deed, on December 28, 1948, was incompetent, as alleged in defendants' cross complaints.

The failure to make such finding indicates that the trial judge accepted the testimony of: Two attending doctors, John and Robert McGregor; hospital nurses; Sisters Theresa and Tarcisius, and other evidence, tending to show that H. H. Rooney knew what he was doing when he signed the warranty deed, and rejected evidence to the contrary.

So that the question before this court is: Was the trial court warranted in finding and concluding from the evidence, that at the time the deed was signed, such a confidential relation existed between H. H. Rooney and Myrtle Rooney as to justify the trial court in setting such deed aside?

Although a confidential relation may have existed in years gone by between H. H. Rooney and Myrtle Rooney, by reason of her attending to correspondence and business for him, it seems clear from the evidence that such confidential relation had ceased to exist some months before the signing of the deed.

The evidence indicates that the last time Myrtle Rooney attended to H. H. Rooney's business was ''during the war years'' from 1942 to 1946. She handled his correspondence ''from 1947 until a year and a half before he died.''

On December 4, 1948, confidential relations and friendly feelings had disappeared and were replaced by antagonism and animosity, as evidenced by the happenings on that date; when Myrtle visited the deceased to ask that he sign the warranty deed.

She ''didn't even get to say anything to him before he jumped right down my throat * * * he said I could sue him and be ———— and he said a lot of mean things. * * * I had never told him we were going to sue him. I told Ed Rooney that at our house * * * but I didn't tell the old man that.''

The record shows, not that Myrtle Rooney maintained a confidential relationship with H. H. Rooney when the warranty deed was signed, but that such a relationship existed at that time, and had existed for some time prior thereto, between H. H. Rooney and Edward Rooney, his youngest son.

The testimony of Edward Rooney shows: That H. H. Rooney and his wife, Charlotte, lived with Edward Rooney and his wife, Mary, ''during the past several years.'' Edward and his wife ''looked after the wants of'' Edward's ''mother and father.'' During the last year and a half before his father's death, Edward looked after his father's business. Edward had a right to sign checks in his father's behalf. H. H. Rooney was ''well acquainted with Mary * * * and trusted her.'' Edward had been in practically day-to-day association with his father and had lived all his life in the same house with his father and mother; their ''associations were * * * quite intimate and friendly all the way around, and satisfactory,'' and ''on the

5th day of November, 1948, Edward had his father'' sign a deed ''to him, and at that time'' his father ''knew what he was doing.''

Edward ''pretty well'' looked after his father's business and welfare. ''* * * I signed checks quite a ways, quite a ways back. I was allowed to sign checks first to the Internal Revenue, because he didn't like that income business.'' Edward also did ''the hard work'' of looking after the upkeep of his father's properties, ''that was way back, but as far as handling money, that wasn't until quite a bit later.'' He did this ''for several years prior to his [father's] death.''

William Rooney of Seattle, Washington, a son of H. H. Rooney, testified: He, in June 1948, ''came to take'' Edward's place, while Edward made a trip east, and in ''taking his place,'' he was ''taking care of the folks and collecting the rent.'' His father ''wasn't looking after his business interests after that time, * * * Ed was doing it for him * * * both in July and December'' of 1948. Both his father and Edward signed the checks.

Myrtle Rooney testified: H. H. Rooney ''had given Ed five and he gave Bill three'' pieces of property. He ''asked me to make the two deeds for the two properties he was going to give us * * * because Ed and Bill had both received their corresponding properties.''

Myrtle said she had the deed prepared at H. H. Rooney's request, on April 15, 1948. ''He told me to bring it out 'tomorrow morning at eleven' '' and ''the next day,'' April 16, 1948, she took the deed to him. At that time he did not sign the deed because ''he said he had talked it over with the family and they had said to leave it like it was, everything was going along all right, and he says, 'I won't have any trouble, with my family at any cost,' and that cost was over getting my deed signed.''

Continuing Myrtle said: On December 3, 1948, ''Ed notified us the old man was sick * * * we told him [Ed] we wanted our deeds. * * * We told him that the old man [his father] had made

a rule that he wouldn't sign any deeds without Edward's consent and that rule—he had made that about ten years before this.'' Edward ''wouldn't help us to get them.''

''Right after we talked to Edward we went out to the house. * * * Edward was there. [H. H. Rooney] indicated he would give us our deed. Q. But he didn't sign it. Why? A. Well, he looked up at Edward like this (indicating) to see what Edward would say and Edward shook his head. * * * and then the old man said, 'I want to talk it over with the family; come out tomorrow morning.' ''

Of the December 3, 1948, meeting, Edward Rooney testified: Myrtle ''came up there * * * her and Asher, her husband, came up there one evening. * * * She came in the door and she said 'I want to see the old man.' That was my father, * * * I says, 'He is in the other room. You can see him. I will take you in to him,' and I led her, went ahead and showed her where he was. She didn't know.'' Asher did not accompany them, ''he sat down on the davenport in the dining room. * * * she says, 'I have a deed for something I want you to sign.' * * * he said, 'What is it,' or 'What is this,' and so she took and started reading a deed there, and it was just a legal description. I think it is the same original one. * * * she read it off to him; a legal description of property to Myrtle and Asher Rooney from H. H. Rooney.''

Edward recognized what property it was when she read the description.

Going on, Edward testified his father said: '' 'What is it, anyway, that you are talking about,' so I told him then. I got up and I says, 'this is the deed to the Central Avenue building.' * * * he looked at me for something of what it was or information on it. * * * She said to him, * * * 'You better sign it because we have already engaged attorneys.' '' He did not sign the deed and Myrtle said: '' 'We are coming back to see the attorneys about this and you will hear from us in the courts. We will have you in Court. * * It was a very short interview anyway.''

When asked if there was any conversation to the effect that "he said he wanted to think it over and for her to come back in the morning," Edward said, "Well, there might have been a little bit." She "asked me if I would have him sign it, or tell him to sign it, and I said, 'No, I can't tell him what to do.'" Myrtle herself, "asked him to sign it. * * * She said, 'You have given Edward property and I want you to sign this deed for me.' * * * he didn't say either way" that he would or would not sign it. When she asked him to sign the deed, "I don't think he looked at me," "he might have."

As related by Myrtle, when she visited H. H. Rooney on the morning of December 4, 1948, "he jumped right down my throat," and said "I could sue him and be ———."

She said that when she visited H. H. Rooney in the hospital on December 27, 1948, he told her to "get Norskog" H. H. Rooney's attorney for thirty years, "and bring him up here to the hospital to authorize it. * * * I want to make sure it is legally okay to give you this deed while I am sick in the hospital."

Both her testimony and that of Norskog show that Myrtle did visit Norskog and talked about the deed and that Norskog did not go to the hospital with her.

In the afternoon of December 28, 1948, after telling H. H. Rooney that Norskog "wouldn't come up with me * * * and Ed Rooney was opposing having him give me that deed * * * he spoke up and he said, 'I know Ed is opposing it,' * * * then he said, 'Asher is my oldest son and he is lame,' and he says, 'I have given plenty of property to both Bill and Edward,' he says, 'I want to give something to Asher because,' he said, 'I provided well for my other two boys and if I didn't give anything to my crippled son the whole town would be talking and I don't want that.' * * * That is about the time" the deed "was signed, too, because then he said he was going to sign it anyway Ed opposed it or not."

H. H. Rooney then signed the warranty deed in the presence of the other room patient, McCartney, and later it was acknowl-

edged before one of the hospital sisters, Sister Theresa who was a notary public.

This court, when considering an appeal in an equity case, has the duty under R. C. M. 1947, sec. 93-216, of reviewing the evidence and of determining if such justifies the findings, conclusions and judgment of the trial court.

On appeal in an equity case, where there is little or no conflict in the evidence which in itself is unsatisfactory in character and furnishes no substantial basis for the findings of the trial court, the supreme court will not hesitate to set them aside and finally determine the right of the parties. Gray v. Grant, 62 Mont. 452, 206 Pac. 410; Sanders v. Lucas, 111 Mont. 599, 111 Pac. (2d) 1041; State ex rel. Nagle v. Naughton, 103 Mont. 306, 63 Pac. (2d) 123.

In North Real Estate Loan & Title Co. v. Billings Loan & Trust Co., 36 Mont. 356, 93 Pac. 40, 44, an action to quiet title, this court said: ''We hold that the tax deed received in evidence in this case is void on its face, and ought not to have been considered by the trial court.

''This being an equity case, and no cause appearing why a new trial or the taking of further evidence should be ordered, it is our duty to finally determine the same. Code Civ. Proc. sec. 21, as amended by the Legislature in Acts 2d Leg. Ex. Sess. 1903, p. 7, c. 1. It is therefore directed that the judgment and order appealed from be, and the same are hereby, reversed, and the cause is remanded to the district court of Yellowstone county, with instructions to enter a judgment in favor of the plaintiff in accordance with the prayer of its complaint.''

The evidence does not support the finding that a confidential relation existed between H. H. Rooney and Myrtle Rooney at the time the warranty deed was signed, and the trial court erred in so holding.

Since this is an equity case and no cause appears justifying a new trial or the taking of further evidence, it is our duty to finally determine the same. R. C. M. 1947, sec. 93-216; North Real Estate, etc. Co. v. Billings Loan & Trust Co., supra;

Gray v. Grant, supra; see Stanton v. Occidental Life Ins. Co., 81 Mont. 44, 261 Pac. 620; Bielenberg v. Eyre, 44 Mont. 397, 120 Pac. 243; State ex rel. U. S. Fidelity & Guaranty Co. v. District Court, 77 Mont. 594, 251 Pac. 1061.

It is, therefore, ordered that the judgment of the district court be reversed and the cause remanded to such court, with directions to enter judgment in favor of the plaintiffs in accordance with the prayer of their complaint.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES BOTTOMLY and ANGSTMAN, concur.

MR. JUSTICE ANDERSON not being a member of the court at the time of oral argument took no part in the decision.