VINSON, APPELLANT, *v.* PELLETIER ET AL., RESPONDENTS.

(No. 6,039.)

(Submitted January 8, 1927. Decided February 9, 1927.)

[255 Pac. 1067.]

*Pledges—Foreclosure—Pledgor not Owner of Property—Return of Property to Owner, When—Sureties—Release from Liability—Equity—Appeal—Findings.*

Appeal—Equity Cases—Findings—When Conclusive.
    1. Where, in an equity case, the evidence is in substantial conflict, the findings of the court will not be disturbed on appeal unless the decided preponderance of the evidence is against them.

Pledges—Owner of Chattel Permitting Another to Assume Apparent Ownership for Purpose "of Making a Transfer Thereof"—Statute—Construction.
    2. Section 8297, Revised Codes of 1921, providing that the owner of a chattel who permits another to assume apparent ownership of it "for the purpose of making any transfer of it" cannot defeat a pledge of it made by the bailee by setting up his own title, construed and *held* to have no application where the apparent ownership is permitted to be assumed for any purpose other than that of transfer or sale, and applies then only if the pledgee received the property in good faith and for value.

Same—Ownership of Chattel—Pledgee must Satisfy Himself as to Title of Pledgor.
    3. Since possession is not title but only *prima facie* evidence thereof, one taking a pledge from the possessor of a chattel, without any other evidence of property or authority to sell, must

---

1.  See 2 R. C. L. 194.
3.  See 21 R. C. L. 638.

[78 Mont. 254.]

satisfy himself as to the title of the pledgor, or assume the risk of having to surrender the property to the true owner.

Same—Pledgor Without Title—Return of Pledged Property to Owner.
4. Where the owner of corporate stock had delivered it to one for the purpose of being turned over to persons entitled thereto upon the happening of a certain event, and not for the purpose "of making a transfer thereof" within the meaning of section 8297, *supra*, and the bailee pledged it instead to plaintiff in an action to foreclose the pledge who was fully conversant with the facts and the respective rights of the parties in the transaction and was therefore not a holder in good faith, the court properly decreed return of the stock to its owner. (See pars. 2 and 3, above.)

Same—Pledging Property as Security for Obligation of Another—Pledgor a Surety.
5. The owner of property who pledges it as security for the obligation of another person becomes a surety, and as such is discharged from liability where the creditor, without the pledgor's consent, alters the terms of the original obligation or in anywise impairs or suspends any remedies he may have against the principal.

Same—Sureties—When Pledgor Released from Liability.
6. Where the owners of corporate stock pledged it as security for the payment of a promissory note on condition that the makers thereof should each month assign their salaries to the pledgee, to be applied in its payment, and the pledgee did not apply the payments so made, but made an independent contract with one of the makers releasing him from his obligation on the note on payment of one-half thereof, and before the other was adjudged a bankrupt accepted certain property in satisfaction of his liability, all without the knowledge or consent of the pledgors, they were released from liability as sureties (par. 5, above), and the court's decree, in an action by the pledgee to foreclose the pledge, that the stock be returned to them was correct.

---

[1] Appeal and Error, 4 C. J., sec. 2855, p. 884, n. 37; p. 885, n. 39.
[2, 3] Pledges, 31 Cyc., p. 812, n. 78, 79. Sales, 35 Cyc., p. 357, n. 5; p. 358, n. 9. Statutes, 36 Cyc., p. 1154, n. 81.
[4] Corporations, 14 C. J., sec. 1118, p. 735, n. 40; sec. 1127, p. 742, n. 63. Pledges, 31 Cyc., p. 813, n. 80, 82.
[5] Principal and Surety, 32 Cyc., p. 37, n. 97; p. 177, n. 74.
[6] Principal and Surety, 32 Cyc., p. 174, n. 44; p. 216, n. 74.

*Appeal from District Court, Lewis & Clark County; W. H. Poorman, Judge.*

ACTION by Z. T. Vinson against A. A. Pelletier and others to foreclose a pledge. Judgment for defendants and plaintiff appeals. Affirmed.

---

6. See 21 R. C. L. 1000, 1001.

*Messrs. Gunn, Rasch & Hall,* for Appellant, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

*Mr. J. H. Brass, Mr. A. P. Heywood* and *Mr. S. C. Ford,* for Respondents, submitted a brief; *Mr. Brass* and *Mr. Ford* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by the plaintiff to foreclose a pledge on 16,733⅓ shares of the capital stock of the Golden Curry Consolidated Mining Company delivered as security for the payment of a promissory note for $5,000, dated July 29, 1916, executed by the defendants Pelletier and Cooper. Separate answers were filed by the defendants Ford, Pelletier and Rothfus, and Brass and Heywood made joint answer. The defendant Cooper failed to appear or answer, and his default was entered. Issue was joined upon replies made to each of the answers, and the cause was tried to the court without a jury. After the conclusion of the trial and the submission of all the evidence by the respective parties, the court made its findings of fact and conclusions of law, and based thereon a judgment was duly entered decreeing a foreclosure and sale of 8,701⅓ shares of the pledged stock in satisfaction of the indebtedness due the plaintiff; that certificates Nos. 24, 27 and 28, for ten shares each, be returned to the defendants Heywood, Brass and Ford, and that Ford and Brass are each entitled additionally to 4,006 shares of the stock held in pledge by the plaintiff. The plaintiff has appealed from the judgment. His assignments of error—twenty-four in number—relate to alleged errors made by the court in its findings of fact and conclusions of law, errors committed in the admission of evidence, and error committed in permitting the defendants Brass and Heywood to amend their answer. We have carefully considered each and all of the assignments of error, and have con-

cluded that the only question necessary to be considered in disposition of this appeal is whether the evidence is sufficient to support the findings and judgment of the court.

By his separate answer the defendant Ford admitted and denied certain of the allegations of the complaint and alleged that prior to the execution of the note and contracts he had purchased 4,016 shares of the stock of the mining company and had paid therefor $2,000, and that he was entitled to such stock; that the same had been included in the certificate of stock issued to Vinson, without his knowledge or consent, and that no one had been authorized by him to pledge or in any manner encumber his stock for the security of such indebtedness or otherwise; that he had demanded that the stock be issued to him, but that the plaintiff had wrongfully withheld the same; that he had no notice of the proceedings whereby his stock was attempted to be pledged as security, and demanded judgment that he be decreed the owner of 4,016 shares, and that the plaintiff be required to deliver the same to him.

The defendants Brass and Heywood, by their joint answer, admitted the execution and delivery to the plaintiff of the note, and that 16,733 shares of the capital stock of the mining company were delivered to the plaintiff as collateral security for the payment of the note, but alleged that the plaintiff, without their knowledge or consent, extended the time of payment of the note and changed the terms and provisions thereof without their knowledge, and by reason thereof the plaintiff lost and forfeited any right to their stock held by him, as collateral security for the payment of the debt. They admitted that under the terms of the agreement, on failure to make payment of the note, the plaintiff was authorized to sell the collateral security. They denied that the plaintiff is the legal holder of the stock certificate, or that he ever demanded payment of the indebtedness. They denied that the indebtedness has not

78 Mont.—17

been paid, and alleged that it has been fully paid and satisfied, and demanded that their stock in the mining company be returned to them.

The defendant Pelletier filed a separate answer, alleging that he instituted bankruptcy proceedings subsequent to the execution and delivery of the note, and that by reason of his discharge in bankruptcy he is relieved from all liability created by reason of the execution of the note. The contents of the separate answer filed by the defendant Rothfus is of no consequence in the disposition of this appeal.

It was agreed by the parties during the trial that the number of shares of stock in the mining company included in the certificate issued to Vinson, in pledge, is 16,693⅓.

From the evidence it appears, without conflict, that in July, 1916, the Jacquemin estate owned or controlled 20,080 shares of the capital stock of the Golden Curry Consolidated Mining Company. At that time the defendants Pelletier and Cooper held an option contract with the Jacquemin heirs for the purchase of such stock for the sum of $10,000, $1,000 to be paid down and the remaining $9,000 to be paid within a few days after July 29, 1916. Pelletier and Cooper, not being possessed of the requisite funds with which to take up the option, borrowed the sum of $1,000 from the plaintiff Vinson, with which they made their first payment on the purchase of the stock under the option contract. Prior to the time the balance of the purchase money became due, the defendants Pelletier and Cooper sold to the defendant Brass 4,016 shares of such stock, and a like number thereof to the defendant Ford, receiving in consideration from each of them the sum of $2,000. Being unable to raise the remaining $5,000, Pelletier and Cooper, on the twenty-ninth day of July, 1916, borrowed that amount from the plaintiff and gave him their promissory note of that date, reading as follows:

"$5,000.                    Helena, Montana, July 29th, 1916.

"Eighteen months after date we promise to pay to the order of Z. T. Vinson, Five Thousand ($5,000.00) Dollars at the office of the American National Bank, Helena, Montana, for value received, with interest at the rate of ten per cent per annum from date until paid. Payable annually. $400.00 per month shall be paid on the principal, commencing Feby. 1, 1917.

"CHARLES H. COOPER.

"A. A. PELLETIER.

"We have transferred and delivered to the legal holder hereof as collateral security, for the payment of this and of any other liabilities of the undersigned to said legal holder hereof, due or to become due, the following property, value of which is Eight Thousand ($8,000.00) Dollars, *viz:* Sixteen thousand six hundred thirty three (16,633⅓) shares of the capital stock of the Golden Curry Consolidated Mining Company, a Montana corporation.

"(One Dollar Revenue Stamp cancelled.)

"And the undersigned hereby give the said legal holder hereof and his assigns, authority to sell the said property, or any part thereof, or any substitutes therefor, and all additions thereto, on the maturity of the above note, or at any time thereafter, or before, in the event of the said securities depreciating in value, at any public or private sale, without advertising the same, or demanding payment or giving notice, with the right to said legal holder and his assigns themselves to be the purchasers. And, after deducting all costs and expenses (including a reasonable attorney's fee), to apply the residue to the payment of any, either or all liabilities as aforesaid, as said legal holder hereof, or his assigns shall elect, returning the overplus to the undersigned; and in case the proceeds of the sale of said property shall not cover the principal, interest and

expenses, the undersigned engages to pay the deficiency forth-
with after such sale, with legal interest.

"CHARLES H. COOPER.

"A. A. PELLETIER.

"Endorsed: Z. T. VINSON."

As of the same date of the note the plaintiff and the de-
fendants Pelletier, Cooper, Brass and Heywood entered into a
written contract (Plaintiff's Exhibit "B"), containing by way
of recital a statement that the defendants named are the owners
of certain of the shares of the capital stock of the Golden
Curry Consolidated Mining Company, a Montana corporation,
in the following amounts: "J. H. Brass 4,016 shares; C. H.
Cooper 6,353⅔ shares; A. A. Pelletier 6,353⅔ shares; and
A. P. Heywood 10 shares." In this contract it is further re-
cited that the plaintiff had advanced $5,000 "which was used
in purchasing said stock," and that the purchase of such stock
would redound to the benefit and profit of Cooper, Brass, Pel-
letier and Heywood, and "enable them to carry out their plans
with reference to the operation of the property of the said
Golden Curry Consolidated Mining Company." It is then
provided that fifty shares should be issued to the parties to the
contract in such proportions as they might agree among them-
selves, and that 16,683⅓ shares should be issued to the plain-
tiff Vinson as trustee, "to be held by him as security for the
payment of the said Five Thousand Dollars ($5,000.00) and
interest"; that the fifty shares so issued should be indorsed in
blank by the respective parties to whom they were issued, "and
said certificates, together with the certificates issued to the said
Z. T. Vinson, trustee, shall be placed by the parties in the
American National Bank, of Helena, Montana, as collateral
security to secure said Vinson for the said sum of Five Thou-
sand dollars, advanced by him as aforesaid; together with in-
terest thereon at the rate of ten per cent per annum from this
date, payable annually." The contract further provided that

[78 Mont. 254.]

the indebtedness should be evidenced by a promissory note payable as follows: "The said Charles H. Cooper and A. A. Pelletier, shall each pay the sum of Two Hundred Dollars per month, beginning on the first day of February, 1917, and the full sum of Five Thousand Dollars shall be paid eighteen (18) months from the date hereof"; that if Cooper and Pelletier, or either of them, failed to make payment when due, then Vinson might "declare the full amount due and proceed to enforce and collect the same"; that in case of foreclosure the stock standing in the name of Pelletier and Cooper should be sold first, it being understood and agreed that Pelletier and Cooper are "primarily liable for said indebtedness and the whole thereof, and that the said Brass and Heywood put up their stock as collateral security in consideration of the benefits received by them on account of said loan."

On the same date another contract (Defendants' Exhibit 1) was made by the same parties, which contains the same enumeration as to the ownership of the shares of stock in the mining company, save that in the second contract it is recited that Vinson is the owner of 3,346⅔ shares of the stock. It is also recited, as in the former contract, that Vinson had advanced the $5,000 for the purchase of the mining stock, and that all of the stock save fifty shares was to be issued in the name of Vinson, as trustee, and placed in the American National Bank, at Helena, as security for the $5,000 so advanced by Vinson. It recites that Pelletier and Cooper are primarily liable, and that Vinson is entitled to 3,346⅔ shares of the mining stock as bonus for the advancement of the $5,000; "said Pelletier and Cooper * * * being the ones who undertake to reimburse said Vinson for said money advanced, and give him said bonus of stock, as aforesaid"; that "in default of the payments to be made by them, to-wit, the sum of $200 each, beginning on February 1st, 1917," Vinson "shall first proceed to foreclose his lien upon the number of 4,345⅔ shares, held

by said Pelletier and Cooper, and apply the proceeds of any sale thereof under the authority herein given to the payment of any sum due from Pelletier and Cooper, on account of said indebtedness of $5,000, and interest.'' It was further agreed that Vinson should not foreclose his lien against the stock held by the other parties to the contract ''and against the number of 2,008 shares held by each, said Pelletier and Cooper, until he shall have first sold said 4,345⅔ each, of the said Pelletier and Cooper stock.'' Upon full payment of the amount due Vinson, it was agreed that Vinson should ''transfer to the parties hereto the stock to which they are respectively entitled, as hereinabove set forth.''

There is conflict in the oral testimony, but therefrom it satisfactorily appears that none of the parties held or owned any of the mining company stock until after payment was made therefor under the terms of the option contract to purchase the same, excepting ten shares theretofore issued to Heywood. Such payment was made and the stock delivered upon the completion of the loan of $5,000, from the plaintiff to the defendants Pelletier and Cooper, with the money borrowed. The plaintiff Vinson refused to loan the money to them with which to take up the option unless they would agree to pledge all of the mining company stock as security for the repayment of the obligation, other than the shares of stock they agreed to give him as a bonus. Ford testified that he advanced $2,000 on the option contract with the Jacquemin estate, with the understanding that if the balance of the money required to take up the option for the stock was not paid, his money was to be returned to him, but that if the option was taken up he should be entitled to receive 4,016 shares of the capital stock of the mining company. Brass testified that he also advanced $2,000 to take up the option, and that it was agreed that he should receive 4,016 shares of the capital stock of the company. Ford

says that he never pledged his stock to Vinson as security for the debt, or otherwise, and that he never authorized it to be so pledged by Pelletier or anyone else. Brass testified that he would not have pledged his stock as security for the debt but for the fact that it was represented to him by Vinson, Pelletier and Cooper that Ford was agreeable to pledging his stock and had given authority to Pelletier so to do. The amendment to the answer of the defendants Brass and Heywood, permitted during the trial, alleging fraud in procuring the pledge of the Brass stock, was in consequence of this evidence.

Vinson testified that he loaned Pelletier and Cooper the sum of $5,000 then required, with which to complete the purchase of the stock of the mining company held under option contract from the Jacquemin estate, and that subsequently he understood that Brass and Ford had each advanced the sum of $2,000 for like purpose. And again, he further stated that at the time he loaned the money he knew that Brass had put up $2,000 of the amount required to take up the option, and that somebody else was putting up a similar amount for like purpose, but did not learn until later that Ford was that person. He also stated that he knew at the time that Brass was to have 4,016 shares for the money advanced by him, but made no inquiry as to the arrangement made, if any, with the other party who had advanced like amount.

There was ample evidence to show that Vinson had knowledge of Ford's interest in the mining company stock at the time of the negotiation of the loan to Pelletier and Cooper, although Vinson denied the same. And it appears that Pelletier and Cooper did not come into the possession of the stock of the mining company held by them under option to purchase from the Jacquemin estate until final payment was made by them on the contract, which was done with the $5,000 so loaned by the plaintiff to them.

From Vinson's testimony it is clear that Pelletier and Cooper were to pay him from their respective salaries as court stenographers the sum of $200 per month each in liquidation of the note, in accordance with its terms, and also that subsequent to the execution of the note in suit he agreed separately with Cooper in writing to release the latter from his portion of the indebtedness provided Cooper would pay one-half of the note, and that such agreement was never called to the attention of, or known to, Pelletier, Brass, Heywood or Ford. He admitted that he received, by reason of assignments made by Cooper of salary to become due the latter, an aggregate amount of more than $45,000, and stated that he did not apply any part or portion thereof upon the note.

There is discrepancy in the evidence as to the number of shares issued and delivered to Vinson in pledge for the indebtedness, all of which is finally made plain by Heywood's testimony to the effect that the number of shares of stock purchased from the Jacquemin estate was 20,080 shares, of which amount there was one certificate issued to Vinson, trustee, for 16,693⅓ shares, held by him in pledge; and there was a certificate issued to Vinson, as a bonus for the loan, of 3,346⅔ shares. "The total of these made 20,040 shares, which is forty shares short of the amount purchased from the Jacquemin estate. There were forty shares that were issued to individuals in the proportion of ten shares each, but introduced in evidence here there are five certificates of ten shares each, one issued to J. H. Brass, one issued to A. A. Pelletier, one issued to C. H. Cooper, one issued to A. P. Heywood and one issued to S. C. Ford, making fifty shares." It appears that certificates of stock in the mining company for ten shares each were issued, No. 24 to Heywood, No. 27 to Brass, No. 28 to Ford, No. 29 to Pelletier and No. 30 to Cooper. It was agreed by counsel, reference being had to a memorandum of the stock certificates issued,

that there were 3,336⅔ shares issued and delivered to Vinson as a bonus for the loan instead of 3,346⅔ shares, thus making a correct accounting of the shares of stock of the mining company as follows:

| | |
|---|---:|
| Bonus to Vinson...... .................... | 3,336⅔ |
| Pledged to Vinson.... ............... ....... | 16,693⅓ |
| Pelletier ................................. | 10 |
| Cooper ................................. | 10 |
| Brass ................................. | 10 |
| Heywood ............................. .... | 10 |
| Ford ................................. ....... | 10 a |

20,080

From Vinson's testimony it appears that he had been loaning money to Pelletier and Cooper on an assignment of their salaries to be earned for a period of about fifteen years, prior to March, 1926, and that he had charged them interest on such loans as high as sixteen per cent per annum.

As to the facts the court found that the defendants Pelletier and Cooper made purchase of 20,080 shares of stock in the mining company from the Jacquemin estate; that during the month of July, 1916, prior to the 29th thereof, the defendants Pelletier and Cooper sold 4,016 shares of such stock to the defendant Brass, and a like number of shares to the defendant Ford, receiving therefor from each of the parties the sum of $2,000; that on July 29, 1916, the defendants Cooper and Pelletier owed to the Jacquemin estate the sum of $5,000 on the option to purchase the stock, and on that day borrowed that amount from the plaintiff Vinson for the purpose of completing the purchase, giving Vinson as a bonus for making the loan 3,336⅔ shares of the stock, and on that date made, executed and delivered to Vinson their promissory note due eight-

een months after date, with interest at ten per cent per annum, payable annually, agreeing by the terms of the note to pay the sum of $400 per month annually, beginning on the first day of February, 1917, and pledging as security for the payment of the note 16,633⅓ shares of the mining company stock; that on the same date the defendants Cooper, Pelletier, Brass, Heywood and the plaintiff Vinson executed the two pledge agreements, Plaintiff's Exhibit "B" and Defendants' Exhibit 1; that at the time of the execution of the note and of the contracts Vinson had notice of the purchase by Ford of 4,016 shares of the stock; that Ford was not present at the time of the execution of the contracts and did not have any knowledge thereof, nor had he authorized any agent or anyone else to act for him or on his behalf with respect thereto, nor did he ever consent to the pledging of his stock as security; that at the time of the execution and delivery of the note and contracts it was understood and agreed that Vinson was to receive from the defendants Pelletier and Cooper an assignment of their salaries as court stenographers, and that $400 per month was to be paid on the debt from the moneys received by the plaintiff by reason of such assignments; that the plaintiff, without the knowledge or consent of the other parties to the contracts, agreed with the defendant Cooper to release him from any obligation for the debt upon the payment of one-half of the note; that the plaintiff received the salary assignments of Pelletier and Cooper, and by virtue of such assignments from Cooper of his salary, received an amount of more than $45,000, no part of which was applied on the note; that the plaintiff did not at any time foreclose or attempt to foreclose his lien against the shares of stock owned by Pelletier and Cooper, prior to the commencement of this action; that on August 8, 1916, a certificate for 16,693⅓ shares of the stock was issued to Vinson, Trustee, and ten shares each to Brass, Ford, Pelletier and

Cooper, to which they were separately entitled; that on March 25, 1916, a certificate for ten shares of stock was issued to Heywood; that the ten shares to which Brass, Ford, Pelletier and Cooper were respectively entitled constituted a part of the transaction had by the parties to the contract on July 29, 1916; and that the ten share certificate issued to Heywood on March 25, 1916, being on the books of the company long prior to the execution of the note and contracts, is not a part of the transaction save so far at it was pledged.

Upon a careful review of all of the testimony we find [1] ample proof to sustain the findings of fact made by the court. While there is conflict in the evidence, the findings cannot be disturbed for the further reason, under our well-settled rule, that findings based on such evidence are controlling. (*Bosanatz* v. *Ostronich,* 57 Mont. 197, 187 Pac. 1009; *Gray* v. *Grant,* 62 Mont. 452, 206 Pac. 452; *Sanger* v. *Huguenel,* 65 Mont. 236, 211 Pac. 349; *Bristol* v. *Bristol,* 65 Mont. 508, 211 Pac. 205; *Kummrow* v. *Bank of Fergus County,* 66 Mont. 434, 214 Pac. 1098; *Thomas* v. *Standard Development Co.,* 70 Mont. 156, 224 Pac. 870; *Willard* v. *Campbell Oil Co.,* 77 Mont. 30, 248 Pac. 219.) The trial court heard the evidence, saw and heard the witnesses on the stand, observed their demeanor and their manner in testifying, and was in better position to determine their credibility and the weight to be given their testimony than is this court on the cold record.

From the facts the court concluded as a matter of law that Ford is entitled to have returned to him 4,016 shares of the mining company stock; that Brass is entitled to have a like amount returned to him; that Heywood is entitled to have his ten shares returned; that the plaintiff Vinson is entitled to judgment against the defendants Cooper and Pelletier, but not against the other defendants, for the amount of his claim together with costs and attorney's fees; and is entitled to **a**

judgment of foreclosure authorizing the sale of the stock of the defendants Cooper and Pelletier. In the judgment, based on the findings of fact and conclusions of law, all of the stock is accounted for as follows:

30 shares ordered to be returned to Heywood, Brass and Ford.

3,336⅔ shares ordered given to Vinson as a bonus.

4,006 ordered returned to Brass.

4,006 ordered returned to Ford.

8,701⅓ ordered sold on foreclosure.

---

20,080 shares.

Our statute provides: "One who has allowed another to [2, 3] assume the apparent ownership of property for the purpose of making any transfer of it, cannot set up his own title to defeat a pledge of the property, made by the other to a pledgee who received the property in good faith, in the ordinary course of business, and for value." (Sec. 8297, Rev. Codes 1921.) This section of our law was adopted *verbatim* from California, and while this court has not had occasion heretofore to interpret the meaning of the language employed, the supreme court of California had applied it before we adopted it as a part of our statutory law. (*Davis* v. *Russell,* 52 Cal. 611, 28 Am. Rep. 647; *Palmtag* v. *Dontrick,* 59 Cal. 154, 43 Am. Rep. 245; *Niles* v. *Edwards,* 90 Cal. 10, 27 Pac. 159.) In the year 1872, California copied this section from the Field Code (N. Y.), and it is merely a restatement of the common law governing the subject.

In construing its meaning the supreme court of California, in the case of *Shafer* v. *Lacy,* 121 Cal. 574, 54 Pac. 72, said: "The phrase 'for the purpose of making transfer of it' we think must have been intended as words of limitation upon the power to pledge by one having the 'apparent ownership' of the property. The section would have a much broader meaning without than with these words. Formerly, a factor to whom

goods were consigned for sale could not pledge them as against the consignor. (Citing cases.) Under this section, however, as it now reads, one who has allowed another to assume the apparent ownership of property for the purpose of sale or transfer cannot recover from the pledgee of such other person, if the pledgee receives the property in good faith, in the ordinary course of business, and for value. The rule of the Code permits the owner to show that the property was not intrusted to the bailee or person assuming ownership, for the purposes of sale, but for transportation or temporary custody and the like objects. And so we understand the note of the Code commissioners. Mr. Jones says: 'Mere possession of a chattel is not title; and one taking a pledge of it is bound to satisfy himself that the pledgor is the owner; and, if he relies solely upon the pledgor's possession, he takes the risk of having to surrender the property to the true owner.' * * * (Jones on Pledges, sec. 54, citing *Gottleib* v. *Hartman,* 3 Colo. 53.) * * * Mr. Benjamin lays down the rule 'that no man can sell goods and convey a valid title to them unless he be the owner, or lawfully represents the owner.' Benj. Sales, sec. 6. And Mr. Edward says: 'As no one can convey the title to another's property without his consent, so it is quite clear that, as a rule, he cannot pledge it or incumber it without some authority.' Edw. Bailments, sec 192. Respondent relies upon *McNeil* v. *Bank,* 46 N. Y. 325, approved in *Barstow* v. *Savage Min. Co.,* 64 Cal. 388, 49 Am. Rep. 705, 1 Pac. 349.''

The correct rule of interpretation of the language employed in our section 8297, and to which we subscribe as being a correct statement of the law, is succinctly stated in 21 Cal. Jur., pp. 301, 302, based upon decisions of the supreme court of California, as follows: ''The phrase 'for the purpose of making any transfer of it,' as used in the Code, must have been inserted in the statute, * * * as words of limitation upon the power to pledge by one having the 'apparent ownership'

of the property. A pledgee relying on the Code and claiming title superior to that of the owner must show that the latter has not only 'allowed' the pledgor to assume apparent ownership, but has done so for the purpose of making a transfer, and also that he acted in good faith, and is a holder for value. Where the apparent ownership of the pledgor has not resulted in injury to the pledgee, and he is not induced to forego any remedy he may have had by reason of the pledge, the pledgee does not hold in good faith and for value within the meaning of the Code. * * * Possession is not title, but *prima facie* evidence thereof only, and one taking a pledge from a possessor of chattels, without other evidence of property or authority to sell, is bound to satisfy himself as to the title of the pledgor; if he relies solely upon the latter's possession, he takes the risk of having to surrender the property to the true owner, except where it is a negotiable instrument. So a pledgee, although acting in good faith, does not acquire title as against the true owner, where the pledgor is not allowed to assume apparent ownership, but is entrusted with property for the purpose of safekeeping or of repairing it, or where he is wrongfully or unlawfully in possession.''

Under the facts in this case, it does not appear that the [4] mining company stock to which Ford was entitled came into the possession of Pelletier and Cooper, or either of them, *''for the purpose of making transfer of it.''* It is apparent from the proof that it was simply delivered to them for the parties entitled thereto upon payment of the amount due under the Jacquemin option contract; and moreover, Vinson as pledgee of the stock cannot, as to Ford, be said to have been ''a holder in good faith, in the ordinary course of business, and for value.'' He was thoroughly conversant with the entire transaction and the respective rights of all of the parties. So that, in our opinion, the conclusions reached by the court as to the Ford stock are supported by the evidence, and the law was properly applied.

This brings us to a consideration of the Brass and Heywood stock, which is in a different category, since they were parties to the contracts made with Vinson.

The statute provides: "Property may be pledged as security [5] for the obligation of another person than the owner, and in so doing, the owner has all the rights of the pledgor for himself, except as hereinafter stated." (Sec. 8798, Rev. Codes 1921.) The history of this enactment is identical with section 8297, except as to interpretation. By it the rule is clearly stated. However, when Heywood and Brass hypothecated their stock as security for the indebtedness, they became sureties. (*Id.* 8195.) "A surety is exonerated (1) in like manner with a guarantor; (2) to the extent to which he is prejudiced by any act of the creditor which should naturally prove injurious to the remedies of the surety or inconsistent with his rights, or which lessens his security, or (3) to the extent to which he is prejudiced by an omission of the creditor to do anything when required by the surety, which it is his duty to do." And a guarantor is exonerated where by any act of the creditor, without the former's consent, the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in anywise are impaired or suspended. (*Id.* 8818.) So that if the creditor Vinson, without the consent of Heywood and Brass as sureties, altered the terms of the original obligation, or in anywise impaired or suspended remedies against Pelletier and Cooper, the sureties are discharged.

In Brandt on Suretyship and Guaranty, section 43, 3d ed., the rule is stated accurately, as follows: "When property of any kind is mortgaged or pledged by the owner to answer for the debt, default or miscarriage of another person, such property occupies the position of a surety or guarantor, and anything which would discharge an individual surety or guarantor who was personally liable, will, under similar circumstances,

discharge such property. This rule is applicable to every variety of circumstances.''

The evidence clearly shows that at the time Brass and [6] Heywood pledged their stock as collateral security for the payment of the note it was agreed that the principal obligors, Pelletier and Cooper, would assign or had assigned their salaries, and agreed that there should be applied therefrom monthly in payment of the note the sum of $200 each. Thereafter, under such salary assignments Vinson drew Cooper's salary to an aggregate amount of more than $45,000, and admittedly, he did not apply one cent thereof in payment of the note. Vinson further says that he made an independent contract in writing with Cooper, to the effect that the latter should be released from his obligation on the note upon payment of one-half thereof. It further appears that Pelletier assigned his equity in the mining stock to Vinson in satisfaction of the former's liability on the note before he was adjudged a bankrupt, without the knowledge or consent of Brass or Heywood; that in the bankruptcy proceedings Pelletier did not list Vinson as one of his creditors or the stock among his assets; and that Vinson never presented any claim against the bankrupt's estate.

It appears beyond doubt that there was a change made in the terms of the contract without the knowledge or consent of Brass or Heywood to their disadvantage as sureties. ''The contract of suretyship imports entire good faith and confidence between the parties as to the whole transaction. The creditor is bound to observe good faith with the surety. He must not do any act injurious to the surety or inconsistent with his rights. He must not omit to do any act required by the surety which duty enjoins him to do, if such omission injures the surety. If he does any act which tends to increase the liabilities of the surety without his assent, or if he makes any arrangement with the principal debtor, without the surety's con-

sent, by which the risk of the surety is materially increased, or by which the surety is induced to part with an indemnity given him by the principal, or if he fails to act when duty requires him to do so, and the omission proves injurious to the surety, it is a settled rule that in all such cases the surety will be discharged, and he may set up such conduct as a defense to any suit brought against him, if not at law, at least in equity." (21 R. C. L. 1000, 1001.)

It being manifest that the court correctly applied the law to the facts, the judgment is affirmed.

*Affirmed.*

Mr. Chief Justice Callaway and Associate Justices Myers, Stark and Matthews concur.