SISKON CORPORATION, a Corporation licensed and doing business under the laws of the State of Montana, Plaintiff and Appellant, v. NEW MINE SAPPHIRE SYNDICATE, a Corporation, JERRY PRESSMAN, MAX SILVERMAN, MARTIN S. ZISSER and MIRIAM RACOFF, a Co-partnership, doing business under the firm name and style of the Silver Company, and CURTIS C. McABEE, Defendants and Respondents.

No. 10775.
Submitted December 7, 1964. Decided March 23, 1965.
Rehearing Denied April 29, 1965.
400 P.2d 867.

DeKalb, Mondale & Johnson, Lewistown, Robert Taylor Adams, Reno, Nev., Corette, Smith & Dean, Sam Chase, Jr. (argued), Kendrick Smith (argued), Butte, for appellant.

William G. Mouat (argued), Franklin A. Lamb (argued), Billings, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal by plaintiff and appellant, Siskon Corporation (hereinafter called "Siskon") from a judgment, adjudging that Siskon take nothing; that a lien filed by Siskon against certain property of New Mine Sapphire Syndicate (hereinafter called "New Mine") be discharged and declared null and void; that an Operating Agreement and a Management Agreement between Siskon and New Mine be cancelled and set aside; that New Mine be restored to possession of the properties subject

348

to the right of Siskon with six months to remove a washing or milling plant installed by it; that New Mine recover from Siskon $183,919.84, together with its costs; and that New Mine have execution therefor.

Siskon filed its complaint on May 17, 1962, seeking to recover from New Mine the sum of $54,960.76 for work done and improvements installed between February 28, 1959, and March 31, 1960, on certain sapphire mining properties of New Mine under a contract known as the Management Agreement, and to foreclose a lien for that amount filed May 31, 1960, by Siskon against the properties of New Mine covered by the Agreement.

On October 8, 1962, New Mine filed its amended answer and counterclaim admitting that Siskon performed certain operations on portions of the lands described in the lien; that New Mine owned the lands; that Siskon had filed the lien; and denying the other allegations of the complaint.

The third defense alleges the entering into of the Management Agreement dated February 28, 1959, and incorporates it by reference; it also alleges that the reasonable cost of Siskon's operations should not have exceeded $6,000.00.

The fourth defense alleges that under the Management Agreement, Siskon's expenses were to be paid from the sale of sapphires mined from the property covered by the Agreement.

New Mine's counterclaim alleges that on January 29, 1958, Siskon's predecessor and New Mine entered into an Operating Agreement which is incorporated by reference, and that the Operating Agreement was superseded for a period of three years commencing February 28, 1959, by the Management Agreement; that the Management Agreement required Siskon to deliver to New Mine all crude sapphires recovered; that from the proceeds of the sale of the sapphires Siskon was to pay its costs and expenses and that any balance was to be divided in the proportions of one-third to Siskon and two-thirds to New Mine; that sapphires and gems of the value of $105,000.00 were removed by

Siskon; that the reasonable cost of such removal was $6,000.00; and that the value of New Mine's two-thirds was $66,000.00, but that Siskon had taken possession of the sapphires and had refused to deliver them or the proceeds to New Mine. The counterclaim then alleged certain violations of both the Operating Agreement and the Management Agreement, the principal ones being that Siskon failed to operate in a diligent manner and that it milled dump material instead of newly-mined ore, with the result that for the period from 1958 to 1962, New Mine was damaged in the sum of $722,668.00.

Siskon's reply admits the execution of the Operating Agreement, that it was superseded for a period of three years commencing February 28, 1959, by the Management Agreement, alleges it is without knowledge or information whether the value of the sapphires removed was $105,000.00, and denies the other allegations of the counterclaim; Siskon also alleged that statements setting forth in detail the items making up the $54,960.76 sued for were received and accepted without objection and became an account stated.

Trial was had before the court sitting without a jury. Proposed findings and conclusions were filed by Siskon and by New Mine. The court filed its findings of fact and conclusions of law, adopting in large degree, New Mine's proposals as to the matters which the court found in favor of New Mine except that the court's conclusion VI allowed New Mine $57,919.84 for its equity in certain sapphires delivered by New Mine to Siskon, whereas New Mine's proposed Conclusion VI claimed $289,056.00 and further that New Mine's claimed damages of $722,668.00 for loss of profits was too speculative to measure.

New Mine did not file any exceptions. Siskon filed objections to the court's findings and conclusions, a motion for leave to amend its reply to conform to the evidence, a motion for new trial, and a motion to amend or alter the judgment. New Mine filed objections. Siskon's objections to the findings and conclusions and all of Siskon's motions were denied.

Twenty-two specifications of error are urged. These alleged errors evolve into the following problems:

1. Whether the trial court properly construed the written agreements;

2. Whether delivery of sapphires by New Mine to Siskon constituted a sale thereof to Siskon;

3. Whether Siskon abandoned the mining properties or terminated the agreements; and

4. The measure of damages.

Some historical background will be helpful to understand some of the problems. The same properties and some of the same individuals involved have been before this court in Sidwell v. New Mine Sapphire Syndicate, 130 Mont. 189, 297 P.2d 299; and Estate of Gadsden, 137 Mont. 82, 350 P.2d 361. Sapphires were first discovered in the 1870's. In 1895, the New Mine Sapphire Syndicate was organized and shortly became a British controlled corporation. C. T. Gadsden became superintendent of the mining properties in 1902 and the properties were successfully operated until about 1922 when production tapered off, due to production costs, labor shortages, declining demand for sapphires, taxes, etc. In 1929, the mines were closed.

Thereafter some sporadic production was had, but never again on a profitable basis. In 1956, American interests acquired the majority of the stock of New Mine. The Company was reorganized and the sale of stock authorized. Various individuals served as directors and officers, but one man, Sidwell, was the "general manager" from 1956 until, according to the Minutes of a meeting of directors on August 10, 1962, Sidwell was removed as "Managing Director."

On January 29, 1958, an Operating Agreement was entered into between New Mine and H. B. Chessher. Chessher assigned the Operating Agreement to Siskon on April 1, 1958.

Subsequently, on February 28, 1959, a Management Agreement was entered into between New Mine and Siskon. New

Mine was authorized to sell stock on March 16, 1959. Siskon operated in 1958 and 1959, taking out 31,565 carats of sapphires in 1958 and 62,358 carats in 1959. Siskon discontinued operations in October 1959.

Referring back now to the trial court's construction of the written agreements. Siskon contends that under the agreements New Mine was obligated to pay Siskon in cash within 90 days for certain reimbursable expenditures. Opposed to this, New Mine contends that reimbursement was to be only from the sales of sapphires, and, no sapphires having been sold, nothing was due.

The first agreement was the Operating Agreement. It provided for the leasing, possession, management and operation of the mining property of New Mine. Among other things the Operating Agreement provided:

"(b)  To enter with good mining equipment, upon the premises of the Yogo Sapphire Mine as soon after April 1, 1958, as weather conditions and Acts of God will reasonably permit, and thereupon to diligently commence prospecting, development and/or mining operations; AND

"(c)  To commence construction of a 100 ton per diem (24 hours) processing (milling) plant, electric power plant, water pipeline, and to perform other construction work, as soon as Second Party is assured that the undeveloped and virgin area of the Yogo dike (lode) * * * contains sufficient sapphires to justify a profitable operation * * * and when the said construction is commenced Second Party will diligently push the completion of the said plant in order that the milling and processing of newly mined ore shall begin as soon as possible; AND

"(d)  To deposit in a bank * * * all sapphires recovered from the mining and milling operations * * * with the provision that the said bank shall hold the sapphires for sale and delivery to any buyer selected by mutual agreement in writing * * * and the bank shall receive and credit to Second Party's checking account all payments for all sapphires sold and such parts

of said payments as may be necessary shall be used by Second Party to pay all accrued costs and expenses, as hereunder authorized, and the balance of said payments shall be by Second Party paid to, and divided equally between, First Party and Second Party."

. The operation in 1958 was under the Operating Agreement. In the light of experience under the Operating Agreement and with some of the dike material placed for weathering and washing in 1959, the parties entered into the second agreement called the Management Agreement. Sidwell, the general manager, referred to in the testimony as "Mr. New Mine," dealt with Siskon and apparently approved the operation.

The Management Agreement, after reciting the existence of the Operating Agreement provided in part as follows:

"That said Operating Agreement * * * be, and the same is, hereby made dormant and inoperative for a period of three years from March 1, 1959, and it is hereby relegated to a state of suspension and status quo for and until * * * March 1, 1962 * * *."

While a reading of this unusual language causes one to pause, it is noteworthy that both parties accepted it and behaved accordingly.

Then in paragraph 3 of the Management Agreement it is provided:

"That beginning with the month of March, 1959, First Party [New Mine] shall and will reimburse Second Party [Siskon] for all money and/or credit advanced and/or furnished each calendar month until March 1, 1962, by Second Party [Siskon] for all operating and capital costs and expenses, all taxes, all operating expenses and the costs of and for all improvements, mining, milling, washing, exploration, development, machinery, equipment, supplies, labor, power, miscellaneous items and general purchases, and for all expenditures of every kind such as and which Second Party [Siskon] may have furnished for the management and operation of the Yōgo Sapphire Mine and the

property described in said Operating Agreement, together with interest thereon as hereinafter provided. First party [New Mine] promises and agrees to pay to Second Party [Siskon], on or before the expiration of 90 days following the month in which said money and/or credit shall became payable to Second Party [Siskon], all of aforesaid money and/or credit, with interest at the rate of 6% per annum on the amount or amounts remaining unpaid after expiration of said 90 day period or periods."

Again in the Management Agreement it is provided in paragraph 13:

"That if First Party [New Mine] fails to pay on or before expiration of 90 days from any calendar month for all of the costs, credits, and expenses billed hereunder * * * then Second Party [Siskon] shall be relieved and released of any covenant and/or obligation hereunder, and Second Party shall not be required to operate hereunder, or to pay for, or to advance hereunder the money or credit * * * while any such amount or amounts remain unpaid."

With the foregoing language from the Management Agreement it is clear that New Mine was obligated to pay in cash; it is equally clear that Siskon billed New Mine monthly for its expenditures. The trial court found to the contrary, and we hold erroneously so. Further comparisons of the two Agreements only emphasize that the parties fixed their responsibilities under the Management Agreement so that we shall not lengthen this opinion by a complete analysis. The trial court, then, did not properly construe the written Agreements.

The second problem is whether delivery of sapphires by New Mine to Siskon constituted a sale thereof to Siskon. The trial court found that it did, and upon this premise awarded judgment against Siskon in the amount of $57,919.84. First of all, the amended answer of New Mine did not allege the delivery of sapphires as a sale. New Mine, through Sidwell, its general manager, delivered to Siskon by means of a letter

dated May 31, 1960, and receipted for by Siskon a box of cut sapphires and a box of uncut sapphires. The relevant portion of the letter read:

"In consideration of the large amount of unpaid indebtedness due to you by the undersigned, and in further consideration of your patience and lenience up to date hereof, and for other good and valuable considerations, received from you by the undersigned, the undersigned does hereby covenant and agree as follows, to-wit:

"1st. That you are hereby authorized, instructed and empowered to sell and/or dispose of all of the * * * sapphires * * * at the best prices obtainable * * *; AND

"2nd. That the net amounts received by you from any of the sales made hereunder by you shall be by you applied as payments upon the oldest indebtedness due by the undersigned to you for any of the expenditures, costs and expenses created and/or incurred by you under that certain operating agreement * * *."

The letter was signed by Sidwell as Managing Director of New Mine. It is seen that the letter accompanying the delivery is clear and unambiguous and shows on its face that there was no sale. Neither the letter nor the receipt shows the quantity of sapphires, but Chessher testified there were 75,000 carats of uncut sapphires and 1,000 carats of cut sapphires. While the documents themselves show no sale, the acts and testimony of the parties also show that neither considered the transaction to be a sale. We shall not detail all of the testimony concerning the matter, but will conclude by remarking that it is incomprehensible how the transaction could be held a sale. Clearly the district court was in error.

Next, we shall consider whether Siskon abandoned the mining properties or terminated the agreements. The court so found. The record is clear that Siskon suspended operations in October 1959. Siskon did not resume operations with the season in 1960. Siskon insists that it was fully justified in not

resuming work. Paragraph 13 of the Management Agreement provides that if New Mine fails to pay for all expenses billed by Siskon in any calendar month within 90 days from the last day of that month, Siskon shall not be required to operate. The agreement is clear.

Apparently the trial court based its finding on the abandonment because of its erroneous conclusion that Siskon was to be paid only from the proceeds of the sale of sapphires which we have previously discussed. We have shown that New Mine was obligated to pay in cash under the Management Agreement. Siskon had billed New Mine every month starting with March, 1959. New Mine paid nothing, but repeatedly acknowledged the indebtedness as evidenced by the letter of May 31, 1960, as previously set out in addition to many other communications, including the corporate minutes, which we shall not detail.

By the end of April 1959, Siskon's bill under the Management Agreement amounted to $12,278.84 which included $11,-500.00 for a power line, a capital cost which New Mine was obligated to pay. Siskon would have been contractually free to discontinue operations at the end of July 1959, but continued on until October 1959. The only testimony elicited was from Chessher who testified that there was no way to go ahead without payment of the debts due, and that New Mine was ignoring the accounts so far as payments were concerned.

As to the same point which we have hereinbefore set up as Problem 4, the district court had awarded damages in the sum of $126,000 on the cost of performance by Siskon, which is obviously an improper measure, but in any event, New Mine as respondent concedes this to be error. In any event, we hold the court to have been in error in finding abandonment as it did.

We have not detailed the numerous facts along the way which bolster our holdings here. Sidwell, the "Managing Director" or the "General Manager" had the apparent and real

authority to bind New Mine, absent fraud which was neither pleaded nor proven. The exhibits in the form of documents, letters, records, etc., fully corroborate the testimony of Chessher, President of Siskon. Siskon very carefully throughout its dealings with New Mine required agreements in writing.

It is apparent that New Mine's corporate management, at least in retrospect from the eyes of the present controlling group, was shoddy and slipshod. However, the same cannot be said of Siskon who supported everything with records and documents.

Having found the district court in error, we now turn to a disposition of the case. Under normal circumstances we might return the matter to the district court for findings. However, the trial judge who heard the matter is no longer on the bench.

So far as Siskon's complaint was concerned, this is an equitable proceeding to foreclose a lien.

█ The duty of this court is set forth in Fey v. A. A. Oil Corporation, 129 Mont. 300, 321, 285 P.2d 578, 589, as follows:

"In considering an appeal in an equity case, this court has the duty under R.C.M.1947, § 93-216, of reviewing the evidence and of determining if such justifies the findings, conclusions and judgment of the trial court and under the facts and circumstances of a particular case to determine where the equities and the preponderance of the evidence lie. That is particularly true here where there is little if any conflict in the evidence. This being an equity case, and no cause appearing why a new trial or the taking of further evidence should be ordered, it is our duty to finally determine the same. Compare Rooney v. Ford, 127 Mont. 92, 256 P.2d 1090, and cases therein cited; Prewett v. Prewett, 127 Mont. 407, 265 P.2d 198." See also Hansen v. Hansen, 134 Mont. 290, 300, 329 P.2d 791.

██ We shall therefore make specific conclusions upon which judgment may be entered:

(1) Under the Management Agreement, New Mine was bound to reimburse Siskon in cash.

(2) Siskon fully performed its obligations under the Management Agreement.

(3) The trial court was in error in denying Siskon any recovery and in declaring Siskon's lien invalid.

(4) The undisputed evidence is that the sum of $54,960.76 was due Siskon from New Mine.

(5) The lien of Siskon is ordered foreclosed.

(6) The decree terminating the Operating Agreement is set aside.

(7) It follows that that part of the decree denying recovery to New Mine for claimed loss of profits is affirmed.

It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, DOYLE and ADAIR concur.